657 P.2d 1184

**Rhoda Ann STRICKLAND, as personal representative of the Estate of Joseph Kay Strickland, Deceased, Plaintiff-Appellant, Cross-Appellee,**

**and**

**Security Insurance Company of Hartford, Plaintiff in Intervention-Appellee,**

**v.**

**ROOSEVELT COUNTY RURAL ELECTRIC COOPERATIVE, Defendant-Appellee, Cross-Appellant,**

**and**

**Cyril E. Carter, Defendant-Appellee.**

**No. 5645.**

Court of Appeals of New Mexico.

Dec. 9, 1982.

Certiorari Denied Feb. 4, 1983.

Eugene E. Klecan, Janet Santillanes, Klecan & Santillanes, P.A., Albuquerque, for plaintiff-appellant, cross-appellee.

Richard F. Rowley II, Clovis, Sarah M. Singleton, Santa Fe, for defendant-appellee, cross-appellant.

Dan B. Buzzard, Clovis, for defendant-appellee Cyril E. Carter.

Nancy L. Garner, Larry D. Beall, P.A., Albuquerque, for plaintiff in intervention-appellee.

## OPINION

WOOD, Judge.

Joseph Strickland was delivering a truckload of soil conditioner to Carter's farm. While unloading, with the bed of the trailer raised, the bed came close to overhead electric wires of the Electric Company (Roosevelt County Rural Electric Cooperative). Strickland was electrocuted. Plaintiff sought damages for wrongful death. The jury's verdict was in favor of Carter; its verdict was against the Electric Company. Plaintiff appeals; the Electric Company cross-appeals. There are five issues: (1) admission of evidence as to the height of the overhead wires; (2) the refusal to add the defendants' liability insurance carriers as party-defendants; (3) the damage award; (4) prejudgment interest; and (5) reimbursement of the compensation carrier.

*Evidence as to Height of Overhead Wires*

There were four overhead wires, three conducted electricity, one was a neutral wire. The trial testimony contains conflicting inferences as to which conducting wire was involved and the precise location of the accident. The briefs proceed on the basis that it was the west conducting wire and that the accident occurred in the third span of wire south of Carter's house. In answering this point, we proceed on the same basis.

One of plaintiff's three theories of negligence, submitted to the jury, was that the conducting wire at the point of the accident was too close to the ground. There was conflicting evidence as to how high this particular wire, at the particular location, should have been above the ground to comply with standards of the National Electrical Safety Code. The actual height of the wire, on the date of the accident, was obviously relevant to the issue of compliance with these standards.

Plaintiff's witness, Davis, measured the height of the conducting wires, the neutral wire and several pole crossarms shortly before the trial. Davis was permitted to testify as to his measurements for the third span of wire and for the spans immediately adjacent on the north and south.

The accident happened September 8, 1976. Davis' measurements were over five years later. The Electric Company contends that Davis' measurement testimony was improperly admitted because there was a failure "to show a similarity of conditions ... [and] the evidence demonstrated a substantial change between the date of the accident and the date to which the testimony related." In answering this claim we do not consider Evidence Rule 407, N.M.S.A. 1978; no one claims the rule is applicable.

■ A showing of substantially similar conditions was required; if the conditions at the time of Davis' measurements were not substantially similar to the conditions at the time of the accident, Davis' measurements would not have been relevant. *Hodgkins v. Christopher*, 58 N.M. 637, 274 P.2d 153 (1954); *Dahl v. Turner*, 80 N.M. 564, 458 P.2d 816, 39 A.L.R.3d 207 (Ct.App. 1969); *see Corcoran v. Traction Co.*, 15 N.M. 9, 103 P. 645 (1909).

Witnesses called on behalf of the Electric Company testified that the only change between the date of the accident and the date of Davis' measurements was that poles, broken in a severe wind storm, had been replaced. The evidence was conflicting as to how many poles were replaced—two or four. There was also a conflict in the evidence as to which poles were replaced; there was general agreement as to replacement of the south pole of the span where the accident occurred; the testimony conflicted as to replacement of the north pole. There was evidence that both old and new poles had a length of 35 feet.

As to the effect of replaced poles on the height of the wire, two items were mentioned. One item was that in the hurry to replace the broken poles, the new poles might have been set deeper into the ground. One Electric Company witness testified that this would explain the difference between Davis' measurements and measurements by representatives of the Electric Company. However, there was no evidence that the replaced poles were, in fact, set deeper, only speculation. The second item was that the crossarms on the new poles were six inches lower than the crossarms on the replaced poles and that this would change the height approximately six inches all along the wire. There was no testimony by which the height of the crossarms, before and after the replacement, can be compared. However, Carter testified that he did not think the new poles affected the vertical height of the wires, that so far as he knew the wires were the same as before.

There was testimony by witnesses, at the scene within a short time after the accident occurred, as to the height of the wires at that time. This testimony varies from 20 to 30 feet. Davis' measurements of the west conducting wire, whether at mid-span or higher points, in the three spans measured, varied from 19 feet 8½ inches to 21 feet 7¼ inches.

There was evidence that the Electric Company took height measurements on September 10, 1976, but had no record of these measurements and, anyway, these measurements were in the wrong place. The Electric Company remeasured on September 16, 1976. There was testimony that on the span where the accident occurred, the height of the west conducting wire at mid-span was 22 feet 6½ inches, and at point of contact the height was either 24 feet 6½ inches or 25 feet. However, subsequent to these measurements, the Electric Company supplied different information to the adjuster for the compensation insurance carrier of Strickland's employer. The adjuster was told that the *high* part of the span where the accident occurred was 22 feet 5 inches and the *low* point was 19 feet 7. inches.

◼ Davis' measurements five years after the accident were within the range of testimony as to wire height at the time of the accident. Because Davis' measurements were substantially similar to some of this testimony, because there was evidence of no height change resulting from the replaced poles, and because of conflicts as to which poles were replaced, we cannot say the trial court abused its discretion in admitting Davis' measurements as evidence.

In the trial court, the Electric Company did not object to Davis' testimony "so far as it relates to the height of the wires at this time"; rather, the Electric Company opposed admission of Davis' measurements "to discredit the measurement of the cooperative people taken at the time or within a week of the accident, I do object to that." Davis' measurements, being substantially similar, were relevant and were properly admitted. The measurements not only tended to prove height at the time of the accident, they also went to the credibility of the Electric Company's measurements. *Tyler v. Dowell, Inc.,* 274 F.2d 890 (10th Cir.1960).

*Refusal to Add a Liability Insurance Carrier as a Party Defendant*

◼ Security (Security Insurance Company of Hartford), the compensation insurer for Strickland's employer, paid compensation benefits for Strickland's death. Security was permitted to intervene in the wrongful death action "to assert its claim to a right of reimbursement" in the event of a judgment in favor of plaintiff. Plaintiff moved that the liability insurance carriers of both defendants be added as defendants because Security had intervened as a plaintiff. This motion was denied. The denial was proper. *Schulte v. Baber Well Servicing Co.,* 98 N.M. 547, 650 P.2d 831 (Ct.App. 1982).

Plaintiff contends that regardless of the decision in *Schulte,* the trial court erred in

failing to add the liability insurance carriers of defendants (if in fact there was liability insurance) as party defendants. Plaintiff argues that a combination of due process [*see Maurer v. Thorpe,* 95 N.M. 286, 621 P.2d 503 (1980)], equal protection and estoppel requires that the insurance companies be defendants in this case. The basis for this argument is an alleged "conspiracy" between insurance companies; plaintiff states: "Obviously the actions of the insurance companies, i.e., the compensation carrier and the Defendant's liability carrier, are in tune and that the Plaintiff is being victimized...." Plaintiff asserts the "real issue ... is whether insurance companies can manipulate with the presence and absence of parties in order to get an advantage.... The case did go to trial with the compensation carrier *present* and the liability carrier *hidden.*" (Emphasis in original.)

The answer is factual. After the decision in *Maurer v. Thorpe, supra,* Security moved to modify the order allowing its intervention so that intervention would occur only when a judgment favorable to plaintiff was to be presented to the court. *See Herrera v. Springer Corporation,* 85 N.M. 6, 508 P.2d 1303 (Ct.App.), *rev'd on other grounds,* 85 N.M. 201, 510 P.2d 1072 (1973). *Compare Varney v. Taylor,* 71 N.M. 444, 379 P.2d 84 (1963). This motion was denied. Written responses in the district court file are to the effect that defendants did not oppose the motion to modify the intervention but that plaintiff did. Having successfully kept Security in the case, plaintiff then sought to have the insurance companies added as parties. Thus it was plaintiff, not Security or the defendants, who was attempting to manipulate the presence of parties. There is nothing indicating any insurance company was "in tune"; no suggestion that the same insurance company was on both sides of the case. *See Varney v. Taylor, supra.* The presence of the compensation carrier at trial was the result of plaintiff's actions.

Plaintiff's argument flagrantly disregards what is shown by the record.

*The Damage Award*

The jury verdict for wrongful death was $105,000.00. The jury failed to find negligence on the part of Strickland. Judgment for the entire amount of the verdict was entered in favor of plaintiff. Prior to entry of judgment, plaintiff moved for an additur or, in the alternative, for a new trial on the damage issue. *See Hammond v. Blackwell,* 77 N.M. 209, 421 P.2d 124 (1966). Plaintiff contends the trial court erred in denying the motions and asserts "[t]he jury's verdict must have resulted from prejudice, partiality, or a mistake on its part as to the measure of damages." *Hammond v. Blackwell, supra.*

■ The damage instruction was based on U.J.I.Civ. 18.30, N.M.S.A. 1978 (1980 Repl.Pamph.). Plaintiff asserts this instruction is mandatory in that it states the basis of a damage award for wrongful death. We agree, *see* the New Mexico decisions cited in the Committee Comment to U.J.I.Civ. 18.30. Plaintiff asserts the jury did not follow the instruction because the damage award was for a lesser amount than established by the evidence. This contention confuses the *basis* for a damage award with the *amount* of a damage award. U.J.I.Civ. 18.30 states that the weight to be given to the evidence on the permissible items of damages is for the jury to determine. Although the evidence would have sustained an award of a greater amount, the fact that the verdict was for a lesser amount does not show that the jury failed to follow the instruction.

■ There was uncontradicted evidence that Strickland underwent pain and suffering between the time of the accident and his death. Plaintiff contends that the amount of the damage award shows that the jury disregarded this evidence. This argument overlooks how damages for pain and suffering are determined. There is no standard fixed by law for measuring the value of pain and suffering; rather, the amount to be awarded is left to the jury's

judgment. *Mathis v. Atchison, Topeka and Santa Fe Railway Co.,* 61 N.M. 330, 300 P.2d 482 (1956). The jury was so instructed. *See* U.J.I.Civ. 18.7, N.M.S.A. 1978 (1980 Repl.Pamph.).

There was also testimony from an economist concerning Strickland's lost earnings between the death in 1976 and trial in 1981, and concerning lost future earnings. This earnings testimony went to the monetary worth of Strickland's life. *See* U.J.I.Civ. 18.30. There is no issue as to the admissibility of the economist's testimony. *See Wilson v. Wylie,* 86 N.M. 9, 518 P.2d 1213 (Ct.App.1973). The question is how that testimony must be treated by the fact finder.

Plaintiff contends that the testimony of the economist established a monetary worth of Strickland's life of around $325,000.00, that an award of $105,000.00 shows that the jury disregarded both the testimony of pain and suffering and the testimony of the economist. The premise for this argument is that the testimony of the economist was uncontradicted. Because this testimony was uncontradicted, plaintiff asserts that she was entitled to a minimum award in the amount to which the economist testified. This claim is incorrect (A) procedurally and (B) on the merits.

### A. Procedure

█ The economist testified as an expert; the economist's damage testimony was an expression of an opinion. *Van Orman v. Nelson,* 78 N.M. 11, 427 P.2d 896 (1967), states:

> The opinion of an expert although uncontradicted is not conclusive of the fact in issue. *Jamison v. Shelton,* 35 N.M. 34, 289 P. 593 (1930). An exception, however, is noted in *Ross v. Sayers Well Servicing Co.,* 76 N.M. 321, 414 P.2d 679 (1966). The fact finder may reject expert opinion evidence in whole or in part. *Lopez v. Heesen,* 69 N.M. 206, 365 P.2d 448 (1961).

The exception noted in the above quotation involves proof of causation as a medical probability in a compensation case; thus, the exception is not applicable. *See Lucero v. Los Alamos Constructors, Inc.,* 79 N.M. 789, 450 P.2d 198 (Ct.App.1969).

The jury was instructed:

> You should consider each expert opinion received in evidence in this case and give it such weight as you think it deserves. You may reject it entirely if you conclude the opinion is unsound.

*See* U.J.I.Civ. 2.13, N.M.S.A. 1978 (1980 Repl.Pamph.).

Plaintiff did not object to this instruction which informed the jury that it could give the economist's damage testimony such weight as the jury thought it deserved. Not having objected to this instruction, plaintiff may not complain of the jury's failure to accept 100 percent of the economist's testimony. *See* R.Civ.P. 51(I), N.M. S.A. 1978 (1980 Repl.Pamph.).

### B. Merits of Plaintiff's Contention

Plaintiff presents two arguments concerning uncontradicted testimony. First, plaintiff points out that the Electric Company introduced no evidence concerning the monetary worth of Strickland's life, and asserts that such evidence could have been produced and could have contradicted the testimony of the economist. Plaintiff seems to assert that the *failure* of the Electric Company to produce such evidence requires a verdict in the amount of the damage testimony introduced by plaintiff. This argument fails to recognize that the burden of persuading the jury as to the amount of damages was upon the plaintiff; the Electric Company had no such burden. *See* U.J.I.Civ. 3.6, N.M.S.A. 1978 (1980 Repl. Pamph.); *Wallace v. Wanek,* 81 N.M. 478, 468 P.2d 879 (Ct.App.1970).

█ Second, plaintiff relies on the uncontradicted evidence rule stated in *Medler v. Henry,* 44 N.M. 275, 101 P.2d 398 (1940). Uncontradicted evidence is not required to

be accepted as true if the evidence is equivocal. *State v. Chavez*, 78 N.M. 446, 432 P.2d 411 (1967). Evidence may be considered equivocal if the circumstances cast doubt on the accuracy of the evidence. *Lucero v. Los Alamos Constructors, Inc., supra.*

We do not list all of the testimony that was equivocal, the following examples are sufficient:

(a) On the basis of Strickland's age, the economist used a work-life expectancy of 34.25 years. This figure was obtained from tables prepared by the U.S. Department of Labor for all male workers in the United States of Strickland's age. The work-life expectancy table included truck drivers, but the work-life expectancy was not specific for truck drivers. The work-life expectancy table states an average of how long people work, "some people work longer and some people work for shorter lengths of time."

(b) Earnings of $12,000 to $13,000 for 1976 were projected as a basic wage for the length of the work expectancy with an increase of 8 percent each year. On this basis, Strickland would have been making over $160,000.00, as a truck driver, in the year 2009. As the economist stated: "That is shocking when we look at it projected that many years into the future ...."

(c) The 8 percent wage increase every year "would include both price and productivity". "Price" seems to mean wage increases due to inflation; a five to six percent price increase was projected for every year for 34.25 years. "Productivity" was explained as more efficient truck driving; a two to three percent productivity increase was projected every year for 34.25 years.

(d) The 8 percent wage increase every year was an average for all truck drivers without regard to the type of truck driving done by Strickland. The higher income of long-haul drivers was included in this average. There is evidence that Strickland did not like long-haul driving.

(e) In figuring how much should be deducted from gross earnings for Strickland's personal maintenance, the economist used a Department of Labor "budget" prepared for Denver, Colorado because that was the closest government "budget"; no "budget" was available for Albuquerque. However this cost "does have to do with locality."

■ The economist's damage testimony was based on the view that Strickland would have an average work life, would have an 8 percent wage increase every year of that work life and that Strickland, an Albuquerque resident, would have the same cost for personal maintenance as a hypothetical person in Denver as determined by a government "budget" of undisclosed detail. This testimony is not at all comparable to an owner's valuation of real estate for the purpose of dividing community property in a divorce action. *See Lahr v. Lahr*, 82 N.M. 223, 478 P.2d 551 (1970), where the uncontradicted evidence rule was applied.

The predictive abilities of economists have not advanced so far that they can forecast the work life or the wage increases for an individual over a period of thirty years. *See Bach v. Penn Central Transportation Co.*, 502 F.2d 1117 (6th Cir.1974). Their predictions involve a "plethora of uncertainties". *See* concurring opinion of Judge Friendly in *Feldman v. Allegheny Airlines, Inc.*, 524 F.2d 384 (2d Cir.1975).

*Turrietta v. Wyche*, 54 N.M. 5, 212 P.2d 1041, 15 A.L.R.2d 407 (1949), held that testimony similar to that of the economist was admissible to prove future earning capacity, but recognized the limitations of such testimony. *Turrietta* states:

It is all problematical at best. It is not questioned that mortality tables are admissible, but possibly not one time in fifty would the life expectancy of any individual come within a year of the actual length of his life. It is, to say the least, problematical whether he would continue to live, continue in health, con-

tinue to work, continue to work with much the same effort and ability he has shown in the past, continue to have the desire and the opportunity to work. Also, that the amount of wages paid him and those following his occupation generally in the past, will continue to be paid; that the wage scale will not be materially affected by depression, strikes, inflation, or war; that interest rates will remain much as they are. However "speculative" such testimony may be, it is the best that can be produced to establish earning capacity over a period of years. A jury of twelve average citizens ordinarily can be depended on to assess damages fairly, after they have heard and considered such evidence.

Damage testimony based on projections of assumptions does not come within the uncontradicted evidence rule stated in *Medler v. Henry, supra,* and need not be taken as true by the fact finder; the jury was not required to accept the economist's testimony as true in this case.

The contentions relied on by plaintiff, to show that the verdict resulted from prejudice, partiality or a mistaken measure of damages, are without merit.

*Prejudgment Interest*

Plaintiff's request for prejudgment interest was denied. The judgment entered February 1, 1982 bears interest at 6 percent from date of entry. Plaintiff contends she is entitled to prejudgment interest of 10 percent.

■ Plaintiff's briefs present numerous arguments for an award of prejudgment interest in a wrongful death case. We do not identify or answer these arguments. The only record of this issue being raised in the trial court is included in the order disposing of several post-trial motions. That order states "that pre-judgment interest requested by the plaintiff is hereby denied." There being no showing that plaintiff's arguments were raised in the trial court, we do not consider them. R.Civ.App. 11, N.M.

S.A. 1978. The only issue we discuss is a legal one—whether prejudgment interest may be allowed in a wrongful death case. *Compare DesGeorges v. Grainger,* 76 N.M. 52, 412 P.2d 6 (1966).

Most prejudgment interest decisions in New Mexico involve breach of contract. The rule most helpful to plaintiff in those decisions is that where the amount of damages is uncertain until fixed by the judgment, the allowance of prejudgment interest is discretionary. *Shaeffer v. Kelton,* 95 N.M. 182, 619 P.2d 1226 (1980); *Kennedy v. Moutray,* 91 N.M. 205, 572 P.2d 933 (1977). *State T. & S. Bk. et al. v. Hermosa L. & C. Co.,* 30 N.M. 566, 240 P. 469 (1925), suggests that as a matter of fairness the same rule should apply in tort cases if the date of the tort is ascertainable.

Even if prejudgment interest in a tort case is allowable, "its allowance as damages rests in the discretion of the jury." *DePalma & Ruppe v. Weinman & Barnett,* 15 N.M. 68, 103 P. 782 (1909). *DePalma* held that the trial court erred in instructing the jury to allow interest on any damages awarded; that it was for the jury to determine whether interest should be awarded.

On the specific question of the allowance of prejudgment interest in wrongful death cases, *Annot.,* 96 A.L.R.2d 1104, 1107 (1964), states:

> [I]t should be noted that since an action for wrongful death is a creature of statute, the compensation ... which may be recovered in such an action is limited by the enactment creating the right, and therefore, in determining what damages are recoverable, the court must look primarily to the wrongful death statute.

If prejudgment interest is recoverable for wrongful death, then further questions must be answered. The Annotation, at 1108, states:

> In state courts the question under discussion appears to have been treated from two standpoints: (1) whether prejudgment interest may be allowed by the

jury or trier of facts in their discretion, and (2) whether it is recoverable as a matter of right. Although there are some exceptions and qualifications, it appears to be the general view that prejudgment interest on wrongful death damages (1) may be allowed in the discretion of the jury or trier of facts, and (2) may not be added to the jury verdict by the court or clerk in the absence of express statutory provision.

It is unnecessary to decide the various questions concerning prejudgment interest in wrongful death cases. Under New Mexico decisions, the view most favorable to plaintiff is that prejudgment interest in a wrongful death case is a matter of discretion. Assuming, but not deciding, that this is the correct view, the appellate issue is whether the trial court abused its discretion in denying prejudgment interest.

■ We comment on only one of the arguments concerning abuse of discretion—that of the delay occurring prior to the trial in 1981. The Electric Company argues that plaintiff was responsible for the delay; in support of this argument, documents, purportedly of federal court proceedings, are attached to the Electric Company's brief. These documents have not been considered. Not having been introduced in the trial court, the documents are not part of the record to be reviewed, and were improperly attached to the brief. *Baca v. Swift & Company,* 74 N.M. 211, 392 P.2d 407 (1964).

■ The record does not show an abuse of discretion in the denial of prejudgment interest; thus under the assumption most favorable to plaintiff, denial of prejudgment interest was not error.

The trial court correctly ordered the judgment to bear interest at 6 percent. The increase in the interest rate stated in § 56–8–3, N.M.S.A. 1978 (1982 Cum.Supp.), from 6 percent to 10 percent, was enacted in 1980. The increased rate did not apply to the complaint, filed in 1977. *Hillelson v. Republic Ins. Co.,* 96 N.M. 36, 627 P.2d 878 (1981).

*Reimbursement of the Compensation Carrier*

After verdict, but prior to judgment, Security moved that the trial court order that it be reimbursed for compensation paid, and to be paid until reimbursement actually occurred. Plaintiff filed an affidavit opposing the motion; Security filed a counter affidavit. The trial court ordered that Security be reimbursed out of the judgment for $105,000.00. The amount of reimbursement was $33,133.72 up to trial, plus the amount of compensation paid subsequent to trial. The trial court also denied plaintiff's request that Security's reimbursement be either reduced or eliminated. Plaintiff claims these rulings were error. The contentions, and our answers, follow.

■ (a) Plaintiff claims that she should not be compelled to reimburse Security because the result will be that plaintiff will end up receiving less than she would have received in compensation benefits; the "wrongful death recovery should not operate to destroy the benefits of the compensation act." *Castro v. Bass,* 74 N.M. 254, 392 P.2d 668 (1964), states:

[W]hen damages are sought and recovered from the tortfeasor, the amount of the recovery is for the full loss or detriment suffered by the injured party and makes him financially whole.

\* \* \* \* \* \*

Plaintiff having recovered . . . [her] damages representing payment in full for . . . [her] injuries . . . [she] may not thereafter claim compensation in addition.

*See Seminara v. Frank Seminara Pontiac-Buick,* 95 N.M. 22, 618 P.2d 366 (Ct.App. 1980).

■ (b) Plaintiff asserts that Security should be barred from any reimbursement because Security "actually impeded and obstructed the Plaintiff and tried to and did assist the Defendants." This argument is frivolous. Examples are: (1) Plaintiff contends obstruction is shown because of Se-

curity's efforts to delay its intervention until after verdict, thus attempting to prevent plaintiff from having the liability insurance carriers of defendants as parties. This was answered in the second issue of this opinion. (2) A witness for Security testified as to the amount of compensation paid and concerning Carter's written statement. Plaintiff asserts this witness's testimony was slanted. There was no slanting in this testimony. (3) Plaintiff claims Security took steps to minimize the amount of plaintiff's recovery. Security's participation in the trial was minimal, and it must be remembered, Security was present at the trial at plaintiff's insistence. Security's closing argument, three typewritten pages in its entirety, reminded the jury of evidence favorable to plaintiff that was obtained through Security, that Security sought only its reimbursement, that the compensation payments were not adequate for the actual loss and the jury should award damages both for monetary loss due to the death and, in addition, for pain and suffering.

(c) Plaintiff asserts that Security should bear a portion of the costs of the litigation inasmuch as Security is to be reimbursed from plaintiff's recovery. Security does not dispute that apportioning costs is proper. *Transport Indemnity Company v. Garcia,* 89 N.M. 342, 552 P.2d 473 (Ct. App.1976). There is no suggestion as to the amount of the costs that should be apportioned. All we are presented with is the claim that apportionment should occur, and that the trial court refused to apportion. Although no monetary amounts were referred to in the trial court, the affidavit and counter affidavit differ as to costs borne by Security, and differ as to any agreement to share costs. In light of these differences, and not being informed as to any monetary amounts, we have no basis to hold that the trial court's refusal to apportion was erroneous.

(d) Plaintiff contends that the amount of Security's reimbursement should be reduced on the basis of equitable principles. The cases relied on are *Continental Cas. Co. v. Wueschinski,* 95 N.M. 733, 625 P.2d 1250 (Ct.App.1981) and *White v. Sutherland,* 92 N.M. 187, 585 P.2d 331 (Ct.App. 1978). Neither case is applicable. The amount of the worker's recovery (*White*) or potential recovery (*Continental*) was a sum available from insurance proceeds. A sufficient distinction is that neither case involved a verdict establishing the "full loss" making the plaintiff "financially whole". *See Castro v. Bass, supra. White* involved a settlement at no more than 10 percent of the damages; the jury verdict in this case established plaintiff's "full loss", and judgment was entered for the full amount of the jury verdict. Having been made "financially whole" by the damage award, plaintiff may not retain both the compensation benefits and the damages recovered. Section 52–1–56(C), N.M.S.A. 1978; *Reed v. Styron,* 69 N.M. 262, 365 P.2d 912 (1961). There is no factual basis for reducing the amount of Security's reimbursement on the basis of equitable principles.

The judgment is affirmed. No appellate costs are awarded.

IT IS SO ORDERED.

LOPEZ and DONNELLY, JJ., concur.