Brian Keith WEIL, as Personal Representative of the Estate of Martin Leonard Weil, Deceased, Appellee,

v.

Florence SELTZER, Personal Representative of the Estate of Alvin Seltzer, M.D., Deceased, Appellant.

No. 88–7070.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1988.

Decided April 28, 1989.

As Amended April 28, 1989.

J. Joseph Barse, with whom Keith Bonner and David P. Sutton, Washington, D.C., were on the brief, for appellant.

Mark A. Binstock, with whom Edward H. Kerman, Rockville, Md., was on the brief, for appellee.

Before RUTH BADER GINSBURG and SILBERMAN, Circuit Judges, and FLOYD R. GIBSON,* United States Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge:

This is an appeal from a final judgment entered on a jury's verdict in a survival and wrongful death action. This case is now before us after two successive trials. The first trial resulted in a verdict for the defendant/appellant; however, the district court set aside the verdict and ordered a new trial after concluding that a contributory negligence instruction was erroneously submitted to the jury. On retrial before a different judge, the jury returned a verdict in favor of the plaintiff/appellee. The jury awarded $1,080,000 under the wrongful death claim and $3,000,000 under the survival act claim. Final judgment was entered in the district court pursuant to that verdict.

Now on appeal the following issues are raised: 1) whether there was sufficient evidence to support a jury instruction on the defense of contributory negligence; 2) whether the district court erred in permitting the testimony of five of the defendant's former patients in order to establish the defendant's habit and routine practice of prescribing steroids to his patients; 3) whether the damages award was properly calculated and based on sufficient evidence in the record; and 4) whether the damages award was excessive as a matter of law.

For the following reasons we vacate the district court's judgment and remand this case for a new trial.

## I. BACKGROUND

This case was filed against Dr. Alvin Seltzer in the district court by Brian Keith Weil, as personal representative of Martin Weil's estate [hereinafter appellee or Weil's estate]. After the case was commenced, Dr. Seltzer died and was replaced by Florence Seltzer, as personal representative of his estate [hereinafter appellant].

On March 27, 1984, Martin Weil died unexpectedly at the age of 54 years. Weil's treating physicians could not explain the cause of his death nor could they account for a series of recent medical problems which he suffered from prior to his death.[1] An autopsy was performed in or-

---

* Of the U.S. Court of Appeals for the Eighth Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. During the ten years leading up to his death, Weil suffered from: severe flu-like symptoms; cysts on his face, neck, and eye lids; a broken hip; a fractured knee; general osteoporosis; a

der to determine the cause of Weil's death. The autopsy and a subsequent investigation into the treatment that Weil received from his allergist, Dr. Seltzer, were very revealing.

Dr. Seltzer had treated Weil for more than twenty years and over the course of this treatment Dr. Seltzer regularly prescribed medication which Weil was led to believe were antihistamines. After Weil's death, however, it was determined that Dr. Seltzer had been prescribing a drug called prednisone, which is a steroid. Suddenly, Weil's treating physicians were able to explain his bizarre medical problems that predominated the last ten years of his life. It became apparent that Weil's illnesses were attributable to his long-term ingestion of steroids prescribed by Dr. Seltzer.

The autopsy, which was consistent with long-term steroid use, determined that Weil's cause of death was a saddle block embolus (a type of blood clot), which contained several bone marrow fragments. The autopsy also revealed significant atrophy in Weil's adrenal glands and severe osteoporosis.

Medical experts testified that Weil's osteoporosis, which was linked to his steroid use, may have caused his bones to crumble thus explaining the presence of bone marrow fragments in the fatal blood clot. Long-term steroid use also may have been the cause of the atrophy in Weil's adrenal glands. This condition reduces the body's ability to ward off infection.

Weil's estate filed suit against Dr. Seltzer and began discovery. Through its discovery efforts, Weil's estate learned that Dr. Seltzer prescribed steroids to Weil on his first visit in 1963 and continued to prescribe steroids over a period of more than twenty years. Indeed, Dr. Seltzer had prescribed steroids just eight days before Weil's death and on at least three other occasions during the three months immediately preceding Weil's death.

The most startling fact revealed in the discovery was the frequency with which Dr. Seltzer prescribed steroids to his patients. Dr. Seltzer's purchase orders for medication during the years 1980 thru 1984, which were produced during discovery, revealed that he purchased 10,000 tablets of the steroidal drugs. Weil's estate then contacted three of the drug companies named in the purchase orders and learned that Dr. Seltzer had purchased more than 1.7 million tablets containing steroids during the 1980–1984 period alone. Weil's estate then contacted eight of Dr. Seltzer's former patients and learned that each had been treated by Dr. Seltzer for many years and they were prescribed pills which Dr. Seltzer represented to be antihistamines and decongestants. All of the patients later learned that the pills prescribed by Dr. Seltzer were in fact steroids. Finally, a number of boxes and bottles labeled with the names of antihistamines and other non-steroidal medications were found in the possession of Dr. Seltzer, Weil, and several of Dr. Seltzer's former patients. These boxes and bottles were mislabeled because they actually contained cortisone, another type of steroid.

## II. DISCUSSION

This case has been tried twice in the district court with each trial presided over by a different judge. The first trial resulted in a verdict in favor of the appellant. The verdict was set aside and a new trial ordered, however, after the district judge concluded that a contributory negligence instruction was erroneously given to the jury. On retrial the jury returned a verdict in favor of Weil's estate.

### A. Jury Instructions

#### 1. Contributory Negligence

The first issue raised in this appeal is whether the district court, in the initial trial, erred in granting the motion for a new trial. The district court granted the

life-threatening drop in blood pressure; an abscess in his groin; pain associated with the collapse of his vertebrae; and a severe infection in his left hand. Many of these illnesses were

unusual for a man of Weil's age. Medical experts called to testify on behalf of Weil's estate linked many of these problems to long-term use of steroids.

motion because it was persuaded that the contributory negligence instruction submitted to the jury was improper and resulted in prejudice.

■ We review the district court's decision to grant or deny a new trial motion under the deferential abuse of discretion standard. *See, e.g., Grogan v. General Maintenance Service Co.,* 763 F.2d 444, 447 (D.C.Cir.1985); *Taylor v. Washington Terminal Co.,* 409 F.2d 145, 147 (D.C.Cir.), *cert. denied,* 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969). This deference is accorded the district court because the district judge is in a position to see and hear the witnesses and is able to view the case from a perspective that an appellate court can never match. *See Founding Church of Scientology v. Webster,* 802 F.2d 1448, 1457 (D.C.Cir.1986), *cert. denied,* — U.S. —, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987). In addition, when a new trial is ordered because of legal error the district court's "decision will ordinarily be affirmed." *McNeal v. Hi–Lo Powered Scaffolding, Inc.,* 836 F.2d 637, 646 (D.C.Cir.1988). With these standards in mind we cannot say that the district court incorrectly ordered a new trial.

Appellant argues that the district court abused its discretion because there was sufficient evidence in the first trial to submit a contributory negligence instruction to the jury. In ordering the new trial the district court stated that it was "persuaded that instructions permitting the jury to find that [Weil] was guilty of contributory negligence were not appropriate in this case and were prejudicial." (J.A. 181).

A party is "entitled to an instruction upon his theory of the case if there is evidence to support it...." *Wegerer v. First Commodity Corp. of Boston,* 744 F.2d 719, 723 (10th Cir.1984) (citation omitted). However, "[t]he evidence presented must be more than a 'scintilla'...." *Wood v. Day,* 859 F.2d 1490, 1493 (D.C.Cir.1988) (quoting *Doe v. Binker,* 492 A.2d 857, 860 (D.C.1985)).

■ The doctrine of contributory negligence operates as a defense under District of Columbia law when a party knows or by the exercise of ordinary care should have known a particular fact or circumstance and should have acted upon the fact or circumstance with reasonable care for his own safety. *See Queen v. Washington Metro. Area Transit Auth.,* 842 F.2d 476, 478 (D.C.Cir.1988). We do not believe that the district court erred in ordering a new trial based on the submission of the contributory negligence instruction because there were insufficient facts to support it. It does not appear to be proper to charge the deceased in this case with contributory negligence when he was merely following his doctor's orders.

In *Morrison v. MacNamara,* 407 A.2d 555, 567–68 (D.C.1979), the District of Columbia Court of Appeals noted:

> In the context of medical malpractice, the superior knowledge of the doctor with his expertise in medical matters and the generally limited ability of the patient to ascertain the existence of certain risks and dangers that inhere in certain medical treatments, negates the critical elements of the defense, *i.e.,* knowledge and appreciation of the risk. Thus, save for exceptional circumstances, a patient cannot assume the risk of negligent treatment.

While the court in *Morrison* was specifically addressing the defense of assumption of the risk, the court noted that these same principles would apply to the defense of contributory negligence in medical malpractice. *Id.* at 568 n. 11.

■ Thus, in order to submit the contributory negligence instruction the evidence must show that Weil knew or should have known that he was taking steroids and he should have exercised reasonable care for his own safety by informing his other treating physicians accordingly. The evidence, however, clearly indicated that Weil believed that the medications prescribed by Dr. Seltzer were antihistamines rather than steroids. In fact, the evidence suggesting that Dr. Seltzer mislabeled the steroids to conceal their identity flies in the face of appellant's argument that Weil knew he was taking steroids.

■ The only evidence presented at either the first or second trial showing that Dr. Seltzer told Weil he was getting steroids came from an interrogatory propounded to Dr. Seltzer:

Interrogatory No. 7: State in detail the substance of all conversations had between defendant and decedent relating to the nature of medications or drugs dispensed by defendant to decedent, including but not limited to the short-term and long-term effects of decedent's ingestion of said drugs or medications, and describe any health hazard warnings related to the same which defendant may contend were given to decedent.

Answer: When I gave him cortisone, I said that is all he could have, and that long-term use could cause problems. (J.A. 135).

From this ambiguous response appellant suggests that Weil knew he was taking steroids for twenty years.

■ Appellant also contends that Weil was contributorily negligent because he should have found out what drugs he was given by Dr. Seltzer. In *Stager v. Schneider*, 494 A.2d 1307 (D.C.1985), however, it was held that a patient did not have a duty to call her doctor to get the results of X-rays which indicated a shadow on her lung. In *Stager* the court noted that although a patient has a duty to cooperate with her doctor, "[i]t is a quantum leap [from requiring cooperation] ... to permitting a duty to be placed on a patient.... To do so would be, in reality, to invert the duty by transferring it from the health professional to the patient." *Id.* at 1312. *Stager* thus places the duty to communicate information to the patient squarely on the shoulders of the physician.

*Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir.), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), an informed consent case, further supports the notion that in the District of Columbia the doctor has a legal duty to inform the patient of the risks and not the other way around. *Canterbury* sets the standard for measuring the performance of a physician's duty to disclose risks as "conduct which is reasonable under the circumstances." *Canterbury v. Spence*, 464 F.2d at 785 (footnote omitted). The scope of the disclosure which the physician is obligated to make to a patient is "objective with due regard for the patient's informational needs and with suitable leeway for the physician's situation." *Id.* at 787. The *Canterbury* court found that a risk is " 'material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy.' " *Id.* (quoting Waltz & Scheuneman, *Informed Consent to Therapy*, 64 Nw. U.L. Rev. 628, 640 (1970)). Failing to disclose particular risk information is a jury question when it "is open to debate by reasonable-minded" people. *Canterbury v. Spence*, 464 F.2d at 788. In neither trial was sufficient evidence presented to show that Dr. Seltzer adequately identified to Weil the medication he was taking or the dangers of its long-term use. Thus, no reasonable jury could have found that Weil was contributorily negligent and the district court did not err in ordering a new trial.

### 2. *Assumption of the Risk*

■ Finally, we note that at the first trial the jury was instructed on both the defenses of contributory negligence and assumption of the risk. The district court, however, only discussed the propriety of the contributory negligence instruction in its order granting a new trial. Nevertheless, we note that since the contributory negligence instruction was not supported by sufficient evidence then the same would be true of the assumption of the risk instruction. This necessarily follows because contributory negligence is determined by an objective standard (knew or should have known) whereas assumption of the risk requires evidence of a subjective nature (actually knew). *See, e.g., Morrison v. MacNamara*, 407 A.2d at 566 ("the inquiry into assumption of risk focuses on what the plaintiff in fact knew, while the defense of contributory negligence requires a determination of what the plaintiff should have

known and acted upon in the exercise of reasonable care for his own safety") (citation omitted). All of the evidence relating to Weil's actual knowledge indicated that he believed he was taking antihistamines.

In the instant case there was barely evidence presented establishing that Weil knew he was taking steroids, let alone that he knew the magnitude of the harm long-term steroidal use might cause. Thus, in the absence of evidence reflecting that Weil knew of the danger of prolonged steroid use and voluntarily accepted the risks, the assumption of risk instruction would be improper. *Id.* at 568. Finally, we note that the defense of assumption of the risk "has rarely been sustained in actions involving professional negligence." *Id.* at 567.

■ Appellant also challenges the district court's ruling on appellee's Motion in Limine which struck the defenses of contributory negligence and assumption of the risk in the second trial due to appellant's failure to provide discovery. We affirm the district court's ruling on two grounds, either of which would be sufficient to sustain the district court's action. First, the evidence advanced in the second trial was much the same as that put forth in the first and it was insufficient to support a finding that Weil was contributorily negligent. Second, appellant did not file a memorandum in response to appellee's Motion in Limine and, under the local rules in the District of Columbia, "[i]f such a memorandum is not filed within the prescribed time, the court may treat the motion as conceded." District of Columbia Local Rule 108(b). Thus, appellant is deemed to have waived his opposition to the Motion in Limine and he may not now complain on appeal. Consequently, there was no error committed by the district court in its decision not to submit the contributory negligence and assumption of the risk defenses to the jury in the second trial.

### 3. *Intervening Cause*

Appellant also argues that the district court, in the second trial, erred in refusing to instruct the jury on the defense of intervening cause. Appellant's theory underlying the requested instruction is based on the diagnosis of Weil's treating physicians made in 1977 which revealed that Weil had osteoporosis. Appellant argues that Weil's treating physicians were negligent in not determining that his osteoporosis was caused by ingestion of steroids. The negligence of Weil's treating physicians is an intervening negligent act that insulates appellant from liability, appellant argues. *See, e.g., St. Paul Fire & Marine Ins. Co. v. James G. Davis Constr. Corp.,* 350 A.2d 751, 752 (D.C.1976) ("If the danger of an intervening negligent or criminal act should have reasonably been anticipated and protected against, the defendant will be held responsible for the damages which result despite the entry of another act in the chain of causation.") (citations omitted).

■ We believe that the district court properly refused to submit the question of intervening cause to the jury. It was not shown that Weil knew he was taking steroids; in light of that it is easy to see why he never advised his other treating physicians that he took steroids. The physicians who treated him subsequent to Dr. Seltzer were at a great disadvantage in diagnosing Weil's deteriorating condition. There was no evidence advanced by the appellant that Weil's physicians were in any way negligent in their dealings with Weil. Quite the contrary, it appears from the trial record that Weil was unable to tell his various physicians (all of whom asked) that he was on steroids since Dr. Seltzer only arguably told him on only one occasion, in over twenty years of treatment, that he was receiving steroids. That one occasion is the one referred to in Dr. Seltzer's ambiguous answer to interrogatory number seven. Finally, there was no evidence that the other physicians' failure to test for steroid use, when the patient denied taking steroids, was below the standard of reasonable medical care.

### B. *"Former Patient" Evidence*

The next issue concerns the testimony of five of Dr. Seltzer's former patients which was admitted in the second trial, over ap-

pellant's objection. The substance of this testimony indicated that Dr. Seltzer had prescribed steroids to other allergy patients while representing the drugs to be antihistamines or decongestants.

The district court admitted the evidence under Federal Rule of Evidence 406 which provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Fed.R.Evid. 406.

Appellant argues that the district court erred in admitting the "former patient" evidence because its admission is forbidden by Federal Rule of Evidence 404(b) which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

■ Again, we review the district court's action for an abuse of discretion. *See Carter v. District of Columbia,* 795 F.2d 116, 126 (D.C.Cir.1986). For the reasons discussed below we believe that the district court abused its discretion in allowing the former patient evidence under Rule 406.

■ Rule 406 allows certain evidence which would otherwise be inadmissible if it rises to the level of habit. In this context, habit refers to the type of nonvolitional activity that occurs with invariable regularity. It is the nonvolitional character of habit evidence that makes it probative. *See, e.g., Levin v. United States,* 338 F.2d 265, 272 (D.C.Cir.1964) (testimony concerning religious practices not admissible because "the very volitional basis of the activity raises serious questions as to its invari-

able nature, and hence its probative value"), *cert. denied,* 379 U.S. 999, 85 S.Ct. 719, 13 L.Ed.2d 701 (1965). *But see Perrin v. Anderson,* 784 F.2d 1040, 1046 (10th Cir.1986) (five instances of violent encounters with police sufficient to establish "habit" of reacting violently to uniformed police officers). Thus, habit is a *consistent* method or manner of responding to a particular stimulus. Habits have a reflexive, almost instinctive quality. The advisory committee notes on Rule 406 illustrate this point:

> A habit ... is the person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic.

Fed.R.Evid. 406 advisory committee's note (quoting C. McCormick, *Handbook of the Law of Evidence* 340 (1954)). *See also United States v. Troutman,* 814 F.2d 1428, 1455 (10th Cir.1987) (evidence of past official conduct not admissible because "[e]xtortion or refraining from extortion is not a semi-automatic act and does not constitute habit"). The former patient evidence in this case certainly does not meet this criteria.

We do not believe the evidence of Dr. Seltzer's treatment of five former patients constitutes habit as envisioned by Rule 406. *Cf. Cannell v. Rhodes,* 31 Ohio App.3d 183, 509 N.E.2d 963, 966 (1986) (court properly excluded proffered testimony of attorney's other clients regarding discussions they had with attorney concerning fees; evidence was not proper habit evidence under Rule 406). In deciding whether conduct amounts to "habit" significant factors include the "adequacy of sampling and uniformity of responses." Fed.R.Evid. 406 advisory committee's note. Thus, one of the concerns over the reliability of habit testimony is that the conduct at issue may not have occurred with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances. *Levin,* 338 F.2d at 272. This concern is not allayed by the former

patient testimony because none of the former patients had ever observed Dr. Seltzer with another patient. Before the former patient evidence could be properly admitted as habit evidence the witnesses "must have some knowledge of the practice and must demonstrate this knowledge prior to giving testimony concerning the routine practice. Where a witness cannot demonstrate such knowledge, he cannot testify as to the routine nature of the practice." *Laszko v. Cooper Laboratories, Inc.,* 114 Mich.App. 253, 318 N.W.2d 639, 641 (1982). Each witness who testified against Dr. Seltzer only knew of the way Dr. Seltzer treated his own allergies. Although they each saw Dr. Seltzer on more than one occasion, he was treating the same patient (the testifying witness) on each occasion. None of the patients were able to testify concerning Dr. Seltzer's method of treating others. Dr. Seltzer's actions might constitute habit only if he reacted the same way each time he was presented with a new patient with allergies. For the former patient testimony to be at all probative it must show that Dr. Seltzer responded the same way with each patient as he did with the testifying patient. *See generally* Annotation, *Admissibility of Evidence of Habit or Routine Practice Under Rule 406, Federal Rules of Evidence,* 53 A.L.R. Fed. 703, 705 (1981) (when considering evidence under Rule 406 as habit "it has been held that it is necessary to critically examine the ratio of reactions to the situations and to show regularity of conduct by comparison of the number of instances in which any such conduct occurs with the number in which no such conduct takes place") (footnote omitted); *see also Wilson v. Volkswagen of America, Inc.,* 561 F.2d 494, 512 (4th Cir.1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978).

■ Weil's estate emphasizes the appellant's failure to contradict the testimony of Dr. Seltzer's former patients, noting that evidence concerning Dr. Seltzer's treatment of his other patients was within appellant's control. We note, however, that the admissibility of habit evidence under Rule 406 does not hinge on the ability of the party seeking exclusion of the evidence to disprove the habitual character of the evidence. *But see Perrin v. Anderson,* 784 F.2d at 1046. Rather, the burden of establishing the habitual nature of the evidence rests on the proponent of the evidence.

■ Evidence concerning Dr. Seltzer's treatment of five former patients is not of the nonvolitional, habitual type that ensures its probative value. Rather the former patient evidence is the type of character evidence contemplated under Rule 404(b). This evidence of Dr. Seltzer's treatment of the former patients was clearly an attempt to show that Dr. Seltzer treated Weil in conformity with his treatment of the five testifying patients. *See, e.g., Outley v. City of New York,* 837 F.2d 587, 592–93 (2d Cir.1988) (evidence of six prior lawsuits filed by litigant improper under Rule 404(b) because it is improper evidence of the character trait of litigiousness); *cf. Carter v. District of Columbia,* 795 F.2d at 131 (admission of police officer's personnel files containing evidence of other bad acts was error because it subjected officers to risk of unfair prejudice). Thus, the evidence was admitted for an improper purpose and was undoubtedly prejudicial to appellant's defense.

We note that under Rule 404(b) the former patient evidence may have been admissible for other purposes, *i.e.,* to show plan, knowledge, identity, or absence of mistake or accident. Indeed, Judge Oberdorfer ruled in the first trial that the evidence could be introduced for that purpose. We, of course, express no view on the correctness of that ruling since that issue is not before us in this case.

Accordingly, the admission of this prejudicial evidence under the standard of "habit" requires us to vacate the district court's judgment.

*C. Damages Computation*

As already noted, this case involves a survival act claim as well as a wrongful death claim. The actual calculation of damages frequently causes confusion, and this case provides no exception to that rule,

particularly as Weil was not a typical salaried employee, but rather a real estate entrepreneur. We will review the accepted methods of calculating damages, first under the survival act, then, pursuant to the wrongful death statute.

■ The law in the District of Columbia on the interests violated and the damages recoverable in this type of case is well settled and was aptly stated in *Runyon v. District of Columbia*, 463 F.2d 1319, 1321–22 (D.C.Cir.1972). The survival act claim seeks to compensate the decedent's estate for the violation of the decedent's security and property interests. *Id.* at 1321. The wrongful death claim, on the other hand, compensates the spouse and next of kin for their loss resulting from the decedent's death. *Id.*

In *Runyon*, it was noted that damages in a survival action should compensate the decedent's estate in an amount based on the decedent's probable net future earnings which are then discounted to present value. *Id.* at 1321–22. This is customarily determined by

> using actuarial tables, based upon large segments of a particular population, together with evidence of the deceased's earnings history. Gross probable future earnings ordinarily approximate [the decedent's] projected average annual income multiplied by the number of years of his life that had he survived he would be earning income, known as probable work life or work life expectancy. From this gross amount is subtracted probable income taxes, both state and federal, for the term of the probable work life, and the amount the deceased would have required to maintain himself and contribute to those entitled to recover under the Wrongful Death Act. The resulting sum is adjusted to reflect the reasonable accumulations of the deceased, usually determined by multiplying the sum referred to by a reasonable percentage to reflect the rate of return had it been invested. This

adjusted amount is the probable net future earnings of the deceased.

*Id.* at 1322 (citations omitted).[2]

In the present case several variables in the above formulation are being challenged. First, appellant objects to the method in which Weil's annual income was determined. Second, appellant objects to the manner in which Weil's expected work-life was determined by Weil's estate. Finally, appellant objects to the amount of the deduction from Weil's gross probable earnings which would have been attributable to his personal maintenance.

### 1. Calculating Annual Income

At trial Weil's estate called Dr. Lurito, an economist, to testify as an expert concerning Weil's anticipated annual income to be used in calculating his probable net future earnings which are recoverable under the survival act claim. In addressing this component of Weil's probable future earnings, the economist used an annual income figure that was based on two elements. The first element was Weil's salary loss of $25,000 per year. The second element, which is challenged by the appellant, was based on a "net worth" loss of $50,000 per year. Weil's net worth loss was estimated by the economist who relied on six financial statements prepared by Weil before his death. The financial statements covered the period from July 1981 to January 1984. The economist expressed his opinion, based on the financial statements, that Weil would have had an annual net worth increase of $50,000 during his expected work-life. Thus, combining these two elements, the economist projected Weil's annual income would have been $75,000.

The salary loss of $25,000 per year was based on Weil's income tax returns for the ten year period from 1971 to 1981. Appellant does not seriously challenge this component of Dr. Lurito's annual income projection, nor do we think such a challenge would have merit.

The net worth element of Dr. Lurito's annual income projection, however, is

---

**2.** At the time *Runyon* was decided damages for pain and suffering were precluded under the survival act; however, that is no longer the case. *See Doe v. Binker,* 492 A.2d at 860.

strenuously objected to by the appellant. Appellant argues that the net worth increases reflected in Weil's financial statements were attributable to appreciation in the value of real estate held by Weil for development purposes. It is argued that the net worth estimates are not a proper element of Weil's annual income since the net worth is not attributable solely to Weil's efforts.

■ Thus, distilled to its barest form, appellant's argument is simply addressing the question of whether passive investment income may be reflected in a damages award in a survival action. Because much of Weil's income was derived from real estate development and investment, a distinction must be drawn between those profits which accrued to him as a result of his work (active income) and that which would have come about regardless (passive income). There is little doubt that Weil's salary is properly considered in calculating his future earnings recoverable in the survival action. This is because salary is active income. Passive income, in contrast, is income derived through investment, capital appreciation, or the efforts of others. Such income is not properly awarded as damages in a survival act claim because passive income will continue to benefit the decedent's estate long after the decedent's death.[3] Thus, in a sense, the decedent's estate has not been damaged by the decedent's wrongful death. It is for this reason that a business enterprise's lost profits are not recoverable in a wrongful death action unless the lost profits are a direct result of the decedent's death. *Cf. Metz v. United Technologies Corp.*, 754 F.2d 63 (2d Cir. 1985):

> Profits of plaintiff's business are admissible in evidence for the purpose of establishing the pecuniary value of that diminution of earning capacity, so long as such profits are not uncertain and speculative and *their loss is a direct result of plaintiff's injury* .... Where plaintiff's business profits depend for the most part on the employment of capital or the labor of others, lost profits are not a proper measure of plaintiff's loss.

*Id.* at 69 (emphasis added, citations omitted). We believe that in the present case the district court erred in allowing Weil's net worth, derived from his financial statements, to be used in calculating his annual income.

■ The District of Columbia has not dealt with the problem of calculating an entrepreneur's lost future earnings, but other jurisdictions have. The Ninth Circuit considered this problem in *Vesey v. United States*, 626 F.2d 627, 630 (9th Cir.1980), where it held that "[i]n those instances when a share of retained earnings is recognized as appropriate for computation of future earnings, plaintiff must make a substantial showing that decedent's own services, efforts and initiative, rather than capital invested or labor of others, was the predominant factor producing the profits of the business." Thus, before the net worth element can be used, Weil's estate must show that the net worth reflected in the financial statements is a product of Weil's "personal effort, skill or ability." *Metz v. United Technologies Corp.*, 754 F.2d at 69. If the net worth depends for the most part on the employment of capital or the labor of others the net worth element is not a proper measure of Weil's probable annual income. *Id.* In the present case there is no evidence tying the net worth figures to Weil's efforts. *Vesey v. United States*, 626 F.2d at 630 ("[R]etained profits were not the result of the decedent's skill and efforts but largely came about by appreciation of the property."). Furthermore, if the net worth estimates are a combined product of Weil's efforts and real estate appreciation, then sufficient evidence should be introduced that would allow the jury a reasonable basis on which to apportion the net worth. *See, e.g., Bischoff v. Dodson*, 405 S.W.2d 514, 519 (Mo.Ct.App. 1966):

---

**3.** Unless the passive investment income is subtracted from the calculation of Weil's future income, his estate may recover that amount twice: once from a jury which considers it as

income and calculates its award accordingly, and again when the actual property held by the estate appreciates and the income is realized.

If a plaintiff makes a substantial showing that the capital invested in his business was relatively insignificant, and that the success of his business was predominantly dependent upon his personal effort and initiative, then loss of profits can be shown, but only as an aid in determining the pecuniary value of plaintiff's services in the business.

*Id.* (citation omitted).

Although there was testimony by Weil's former partner as to Weil's activity in the business during his lifetime, the economist did not even attempt to sort out that portion of the increase in Weil's net worth attributable to his active participation in the business and that which derives from the natural tendency of real estate to appreciate regardless of man's activity. Thus, on retrial before the net worth values may be used as an element of annual income, appellee's expert must attempt to factor out the elements of return on capital invested and the markup on hired labor. *Iowa–Des Moines Nat. Bank v. Schwerman Trucking Co.,* 288 N.W.2d 198, 203 (Iowa 1980), *overruled by implication on other grounds, Weitl v. Moes,* 311 N.W.2d 259, 265 (Iowa 1981).

■■■ While we recognize that this assessment may involve some amount of speculation, as with many of the predictions that courts routinely make when determining future events such as work-life expectancy, future income, and future expenses, this does not relieve the parties of the need to present competent evidence on this issue. *Cf. District of Columbia v. Barriteau,* 399 A.2d 563, 568 (D.C.1979). The amount of the net worth attributable to Weil's efforts need not be established with mathematical certainty, but appellant must produce sufficient evidence for the jury to make a reasoned determination. *Cf. Metz v. United Technologies Corp.,* 754 F.2d at 69.

2. *Determining Weil's Expected Work–Life and Personal Maintenance Expenses*

Finally, appellant argues that the district court erred in allowing Dr. Lurito's testimony because it was based on an assumption that Weil would have worked until the age of 70. Mrs. Weil, the decedent's wife, testified that her husband planned to work until age 70. Appellant maintains that Weil's work-life expectancy should have been determined by relying on actuarial tables rather than Mrs. Weil's testimony. Ironically, appellant also argues that Dr. Lurito's testimony was not supported by sufficient evidence because Dr. Lurito relied on Department of Labor tables to determine the proper percentage of Weil's income to be deducted for his personal maintenance.

Once again we note that our review of the district court's evidentiary rulings is limited to an abuse of discretion. *See District of Columbia v. Barriteau,* 399 A.2d at 568 ("[T]he decision to admit expert testimony lies within the sound discretion of the trial court.") (citation omitted). We do not believe that the district court abused its discretion in allowing Dr. Lurito's testimony.

Expert testimony is warranted when the issues involved in the case are "related to some science, profession, business or occupation as to be beyond the ken of the average layman, and the expert witness must have knowledge of the subject area sufficient to aid the trier of fact in its search for the truth." *Hughes v. Pender,* 391 A.2d 259, 262 (D.C.1978) (citation omitted). It has been held that the "task of projecting a person's lost earnings lends itself to clarification by expert testimony because it involves the use of statistical techniques and requires a broad knowledge of economics." *Id.* (citation omitted).

■■■ In *Barriteau,* the District of Columbia Court of Appeals was satisfied that the expert's testimony was supported by a proper factual foundation. The expert in *Barriteau,* Dr. Lurito, is the same expert who testified in the instant case. In *Barriteau,* Dr. Lurito based his testimony concerning life expectancy on HEW tables and work-life expectancy was based on Department of Labor statistics. *District of Columbia v. Barriteau,* 399 A.2d at 565. Thus, it appears that *Barriteau* provides

some support for appellant's claim that Weil's work-life expectancy should have been based on Department of Labor statistics rather than Mrs. Weil's testimony. Nevertheless, we do not believe the district court abused its discretion in allowing Dr. Lurito's testimony. Statistics, such as those prepared by the Department of Labor on work-life expectancy, are only one tool which may be used by an expert in forming an opinion.

The statistics are merely a substitute for an educated guess and are used when no other reliable information is available. Thus, in a sense statistics are an attempt to take the speculation and conjecture out of the damages equation. *Cf. Hughes v. Pender*, 391 A.2d at 263 ("[E]xpert testimony can provide a rational basis for the jury's determination of an individual's future earnings, and can thus minimize the risk of jury speculation present whenever future earnings must be predicted.").

In a case such as the present one, however, where we have some evidence, albeit the self-serving testimony of Mrs. Weil, concerning the anticipated work-life expectancy of the decedent the expert may base his opinion on the available testimony. The appellant remains free to cross-examine Mrs. Weil as well as the expert. In addition, the appellant may produce his own expert to offer a contrary opinion on Weil's work-life expectancy or he may offer the Department of Labor statistics into evidence and request the expert to base his opinion on the work-life expectancy contained in the Department of Labor's table. Indeed this is what occurred in the present case.

The district court ruled that Dr. Lurito would have to calculate Weil's lost earning capacity "both ways" using the assumed work-like expectancy of 15¼ years determined from Mrs. Weil's testimony and the nine years obtained from the Department of Labor table. We believe the district court did not abuse its discretion by requiring Dr. Lurito to calculate the damages based on both work-life expectancies because ultimately the damages issue is a jury question and by having Dr. Lurito

give an opinion based on both assumed work-life expectancies it gave the jury a range to choose from when assessing damages.

Finally, our analysis of Weil's work-life expectancy applies with equal force to the issue concerning the proper method of affixing the deduction from gross probable earnings which would have been expended by Weil in providing for his personal support and maintenance. Appellant argues that Dr. Lurito's testimony was not supported by sufficient evidence because the deduction for Weil's maintenance was determined by using the Department of Labor statistics rather than evidence of Weil's actual expenses which appellant maintains was available and sought through discovery. The Department of Labor statistics relied on by Dr. Lurito reported that a person with Weil's level of income would have spent thirteen percent of his annual income on his personal maintenance.

This very issue was addressed in *Higgins v. Kinnebrew Motors, Inc.*, 547 F.2d 1223 (5th Cir.1977). In *Higgins* an expert's testimony was challenged on appeal because in calculating the damages to be awarded in a wrongful death action the expert based the personal maintenance deduction on statistics from the United States Bureau of Labor rather than the actual expenses of the decedent. The Fifth Circuit, interpreting Florida law, held that the "admission of the [expert's] opinion ... which was formed by reliance on figures from the Bureau of Labor Statistics, does not provide a basis for reversal." *Id.* at 1226 (footnote and citation omitted).

We note, however, that in *Pennsylvania Dep't of Transp. v. Phillips*, 87 Pa. Cmwlth. 504, 488 A.2d 77 (1985), the court refused the admission of a personal maintenance study prepared by the Department of Labor. The court concluded that the personal maintenance study was "irrelevant because of its too general applicability." *Id.* 488 A.2d at 88. *But see McClinton v. White*, 497 Pa. 610, 444 A.2d 85, 86 (1982) (lower court's instruction on maintenance deduction was proper because of court's reference to expert's calculations

which were based on average incomes compiled by the United States Department of Commerce and tables on work-life expectancies compiled by the United States Department of Labor).

▮ In this regard, however, we must agree with the appellant. If sufficient, reliable evidence of Weil's actual expenses is available then the district court should give the appellant the latitude to introduce this evidence. Once again we note that the actual maintenance deduction is a jury question and if the evidence of Weil's actual maintenance expenditures will assist the jury in this determination then the evidence should be permitted. Weil's estate is free to argue to the jury as to why the statistics are more accurate than the evidence of actual maintenance expenses presented by the appellant. *See, e.g., Strickland v. Roosevelt County Rural Elec. Coop.*, 99 N.M. 335, 657 P.2d 1184, 1191 (Ct.App. 1982) (recognizing the limitations of estimates of work-life expectancy and personal maintenance deductions based on Department of Labor tables), *cert. denied*, 99 N.M. 358, 658 P.2d 433 (1983), *cert. denied*, 463 U.S. 1209, 103 S.Ct. 3540, 77 L.Ed.2d 1390 (1983). Likewise, when the personal maintenance study is introduced by Weil's estate, appellant is entitled to expose any weaknesses in the assumptions on which the study and the expert's opinion are based. Expert testimony, as with any other evidence, is not binding upon the jury. *See Hughes v. Pender*, 391 A.2d at 263–64. And, in reaching its verdict the jury is entitled to exercise its own judgment in determining the weight to be given the evidence. "It is the function of the jury to determine the amount of damages to which plaintiff is entitled and the jury [is] free to reject any of the ... [expert's] assumptions." *Id.* at 264; *see also Higgins v. Kinnebrew Motors, Inc.*, 547 F.2d at 1226.

If reliable evidence of actual maintenance expenses is not available, however, it is not an abuse of discretion for the district court to exclude the evidence and instead use only the available statistics. And,

while we believe that the thirteen percent figure obtained from the Department of Labor study appears to be a fairly small deduction for Weil's personal maintenance when compared to personal maintenance deductions in similar cases, we believe that this is a matter of the weight to be given the study and does not affect its admissibility.

It seems that the parties want to have it both ways, relying on statistics when it serves their interests, and when it does not, they want to rely on nonstatistical evidence. This they are not entitled to do.

▮ Under the wrongful death act the jury must determine the portion of the decedent's income that went for the support of his beneficiaries each year; that figure is then multiplied by the decedent's work-life expectancy or the beneficiary's life expectancy, whichever period is shorter, and then discounted to present value. In addition, the appropriate family members are compensated for the value of services lost to the family as a result of the decedent's death. *Doe v. Binker*, 492 A.2d at 863. In reaching this award, the District of Columbia has found expert testimony useful only as a "guideline and 'may not be adopted at its face value as the sole basis for the determination of damages for death.'" *Id.* at 864 (quoting *Thomas v. Potomac Elec. Power Co.*, 266 F.Supp. 687, 695 (D.D.C.1967)). Other than the problems in calculating the decedent's income, which were just discussed in the context of the survival act, there did not appear to be a problem in the wrongful death award.

Because we vacate the judgment and remand this case to the district court for a new trial we need not address the remaining issue raised on appeal.[4]

### III. Conclusion

We affirm in part and reverse in part. We affirm the district court's order granting a new trial because in the first trial the jury was improperly instructed on the defense of contributory negligence. We also affirm the district court's evidentiary rul-

---

**4.** Appellant also challenges the jury's verdict rendered in the second trial as excessive as a

matter of law.

ings in the second trial with respect to the calculation of Weil's work-life expectancy and the proper deduction for his personal maintenance. However, when this case is retried the district court should determine whether there is sufficient reliable evidence of Weil's actual maintenance expenses. If sufficient reliable evidence is available then appellant should be allowed to introduce the evidence in any subsequent trial.

Finally, we reverse the district court's decision in the second trial which allowed the testimony of five of Dr. Seltzer's former patients as it was improperly admitted as evidence of habit under Rule 406. However, we recognize that this type of testimony may be admissible and of probative value under Rule 404(b). We also reverse the district court's ruling which allowed an expert witness to project Weil's probable annual income based, in part, on the net worth of his real estate holdings. Because the net worth was based at least in large part on the appreciation of real estate, it was not a proper basis on which to calculate Weil's probable annual income.

Accordingly, we vacate the judgment and remand this case to the district court for a new trial.