**Sharon Boone HENDERSON,**
**Appellant**

v.

**GEORGE WASHINGTON UNIVERSITY d/b/a George Washington University Medical Center and Medical Faculty Associates, and Michael Salem, Appellees.**

No. 05–7054.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 10, 2006.

Decided June 2, 2006.

---

John D. Quinn argued the cause and filed the briefs for appellant.

James P. Gleason, Jr. argued the cause and filed the brief for appellees.

Before: GRIFFITH, Circuit Judge, and EDWARDS and SILBERMAN, Senior Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge EDWARDS.

EDWARDS, Senior Circuit Judge.

After a seven-day trial, a jury found that defendant-appellee Michael Salem, M.D. ("Dr.Salem") did not violate the standard of care during his performance of Roux–en–Y gastric bypass surgery on plaintiff-appellant Sharon Boone Henderson. Appellant now seeks to overturn the jury's verdict on the ground that the District

Court improperly excluded evidence that supported her claim that Dr. Salem made a critical mistake during surgery. Appellant claims further that Dr. Salem's surgical error both breached the applicable standard of care and caused her not to be able to achieve anticipated weight loss. The District Court found that the disputed evidence—a post-surgery report relating to another patient of Dr. Salem's, along with related deposition testimony—had limited probative value that was significantly outweighed by the danger of unfair prejudice and the potential to confuse the jury.

We find that the District Court greatly overestimated the potential for prejudice and confusion, and seriously underestimated the probative value of the disputed post-surgery report in light of appellant's need to impeach and rebut the case presented by appellees as well as to rehabilitate her expert witness. Therefore, we vacate the jury verdict, reverse the judgment on the verdict, and remand the case for a new trial.

## I. BACKGROUND

### A. Henderson's Surgery

Sharon Boone Henderson weighed 367 pounds by the time she was 34 years old. After attempting and failing to lose weight by resort to numerous diets, Henderson decided to undergo Roux–en–Y gastric bypass surgery. In the Roux–en–Y procedure, a small "new" stomach or "pouch" is surgically formed from the top portion of the existing stomach by using several rows of surgical staples to separate the pouch from the remainder of the stomach. After the pouch is formed, the small intestine is severed a few inches below the bottom of the "original" stomach and then attached to the pouch, thereby permitting food to bypass the main stomach chamber.

The new connection formed between the pouch and the small intestine is called an "anastomosis." The anastomosis and truncated stomach pouch are designed to reduce food intake by creating a sense of fullness. Roux–en–Y surgery also restricts the ability of the digestive tract to absorb nutrients from the food being consumed.

Henderson's Roux–en–Y surgery was performed at George Washington University Medical Center ("GW Medical Center") by Dr. Salem on December 12, 1997. Within the first six weeks of her surgery, Henderson lost 60 to 65 pounds. Sometime during the following spring or summer, however, Henderson began to notice that the small portions of food that were supposed to satisfy her appetite did not do so. Despite feeling as if she was "starving [her]self," Trial Tr. (1/24/05) at 377, Henderson nevertheless stuck to her small portion regimen through the remainder of 1998. By the end of 1999, her weight had dropped to 250 pounds.

In early 2000, however, Henderson suddenly gained 25 pounds. As a result, she attempted to contact Dr. Salem to discuss her situation. When she called GW Medical Center, however, she was informed that he was no longer employed there. Instead, she was referred to Dr. Paul Lin.

Henderson met with Dr. Lin in April 2000, at which time he suggested that perhaps Henderson's stomach pouch had expanded. He noted that it might be possible to remedy this problem with a second procedure. Henderson agreed to the follow-up surgery, which Dr. Lin performed in October 2000. During the procedure, Dr. Lin reduced the size of Henderson's gastric pouch from 60 to 10 cubic centimeters, although he did not reduce the diameter of her anastomosis.

In 2003, Henderson had an endoscopy done to assess the effects of her second

surgery. Dr. Ahmed Hegab, the gastroenterologist who performed the endoscopy, informed Henderson that, in addition to having acid reflux disease, he believed that her anastomosis was too large for effective weight loss. He suggested the possibility of further surgery. At the time of trial, Henderson had yet to pursue that course.

## B. Pre–Trial Activities

Henderson, along with two co-plaintiffs, Helen Jones and Janice Grant, filed suit against Dr. Salem and George Washington University on February 1, 2002. Jones and Grant were also former patients of Dr. Salem's, undergoing their own Roux–en–Y surgeries on April 28, 1998 and February 3, 1999, respectively. The three plaintiffs together alleged that Dr. Salem used improper surgical techniques, resulting in stomach pouches and anastomoses that were too large to permit them to achieve their desired weight loss.

In response to the complaint, appellees filed, *inter alia,* a motion to sever the three charges. On January 19, 2004, the District Court found that, "[a]lthough each trial will involve some overlap of expert testimony, the facts and circumstances of each plaintiff's claim vary so substantially" that the requirements of Federal Rule of Civil Procedure 20—governing permissive joinder of parties—were not met. *Grant v. Salem,* CA No. 02–181, Mem. Op. at 2 (D.D.C. Jan. 19, 2004), Joint Appendix ("J.A.") 45. Thus, the court ruled that "the three claims in this case are misjoined and shall be severed going forward." *Id.*

By the time the motion to sever was decided, Dr. Salem had already been deposed. The parties anticipated the court's severance ruling, however, and thus agreed to segregate the deposition questions to the circumstances of each plaintiff wherever possible. Nevertheless, one overlapping line of questioning involved a post-surgery report prepared by Dr. Paul Steinwald, the surgical resident who worked with Dr. Salem on the Helen Jones surgery ("Jones Report"). The Jones Report stated, *inter alia,* that Dr. Salem had created a three-centimeter anastomosis during the surgery—a size that, if measured internally, is generally considered to violate the standard of care. During his deposition, Dr. Salem conceded that he "consistent[ly]" made anastomoses the same size during each surgery. Salem Dep. at 39, J.A. 376. He acknowledged that the three-centimeter characterization in the Jones Report was "accurate," although he qualified his answer by suggesting that the report described the *external* anastomosis measurement; Dr. Salem speculated that the *internal* measurement was likely "between a centimeter or more." *Id.* at 46, J.A. 383.

## C. The Trial

Recognizing the potential importance of the three-centimeter description in the Jones Report, Henderson pressed from the beginning of trial to have Dr. Salem's deposition with attached exhibits, including the Jones Report, included in the record. Appellees sought to exclude the Jones Report and the relevant deposition testimony of Dr. Salem, arguing that those pieces of evidence would unfairly bootstrap the alleged negligence relevant only to the Helen Jones litigation into the case at bar. Appellees also contended that appellant was attempting to omit deposition passages where Dr. Salem explained that he made the *external* diameters of his anastomoses three centimeters, while the *internal* diameters were generally one centimeter.

At the outset of appellant's case, the District Court ruled that, given the early stage of the trial and therefore the court's unfamiliarity with the depositions and the

lines of inquiry to be pursued by the parties, it was appropriate to deny appellant's request to admit the Jones Report and attached deposition testimony. In making that determination, the trial judge stated that he was "concerned that something taken out of context could in some way ... unfairly prejudice the Defendant and confuse the jurors." Trial Tr. (1/19/05) at 92. More specifically, the judge stated:

> Now, the Court is concerned, because this deposition preceded its ruling on severance, that any reference in the depositions to multiple cases could lead the jurors to the natural inference, to some degree, that the lawsuit initially was a lawsuit with regard to more than one case. And that—for reasons which they, of course, are not privy to nor can be privy to, that they may be in some way, through their own natural inferences, prejudiced by thinking that, oh, there is more than one suit against this doctor; this is only one of a series of suits, which was the very prejudice, in no small part, that this Court [was] concerned about avoiding by granting the Severance Motion.

*Id.* at 93–94. In an attempt to mitigate the effect of this ruling on Henderson, the District Court permitted her to ask questions about the contents of the Jones Report as "hypotheticals." The District Court said:

> [Henderson's counsel] will be free, in crafting his hypotheticals, to use the same facts that are in the record as it related to the Jones case, without identifying the Jones case, but whatever the facts are that were in the Jones case, he can put that into his hypothetical—again, without specifically referencing the Jones case.

*Id.* at 94. The District Court concluded by noting that it would be willing to revisit the issue after the testimony of appellant's expert witness, Dr. James Balliro. Thus, "the issue of what can be read ... from the depositions of Dr. Salem—what can be read to this jury such that there is no danger of a prejudicial inference being drawn by the jury is still an open question." *Id.*

Following appellees' cross-examination of Dr. Balliro, Henderson again sought to admit the previously rejected Jones Report and relevant deposition testimony of Dr. Salem. She noted that, during cross-examination, appellees asked Dr. Balliro a series of questions about how he arrived at his opinion in a 2003 report that Dr. Salem had constructed a three-centimeter anastomosis. Appellees noted specifically that there was nothing in *Henderson's* post-surgery report to indicate the size of her anastomosis. According to Henderson, this line of questioning unfairly undermined Dr. Balliro's credibility, because he was unable to state that, in part, he explicitly relied on the Jones Report in drawing the conclusion that Henderson's anastomosis was three centimeters. The District Court again refused to admit the Jones Report, and instead stated that, "to the extent what you are pointing out is something you can go into on Redirect, you are going to have free reign to do it. You can rehabilitate." Trial Tr. (1/21/05) at 265.

Soon after this instruction, appellant asked Dr. Balliro on redirect examination about his previous exchange with defense counsel on cross-examination:

Q: Thank you. Now, you were asked some questions about what you relied on for the opinion that Dr.—in your report, that Dr. Salem fashioned a 3–centimeter anastomosis.

A: Yes.

Q: And did you rely on Dr. Salem's deposition for that opinion?

A: Yes.

Q: And did you rely on another operative report referred to in that deposition?

*Id.* at 280–81. Defense counsel objected before Dr. Balliro could respond to the last question, and the parties conducted a bench conference on the record. Henderson's counsel indicated that he thought his line of questioning was "rehabilitative" and therefore had been sanctioned by the court. The trial judge had a different view, however, responding that rehabilitation did not include "any drifting into this other operative report which could have unnecessary ... prejudicial effect on the Defendant." *Id.* at 285.

Henderson attempted yet again to introduce the Jones Report following the defense's direct examination of Dr. Ronald Chamberlain, GW Medical Center's chief surgical resident at the time Henderson's original Roux–en–Y surgery was performed. Dr. Chamberlain testified that he served as Dr. Salem's first assistant in approximately 10 to 15 Roux–en–Y surgeries, including Henderson's. He maintained that on each occasion they attempted to make the anastomosis between 1 and 1.5 centimeters in diameter. Henderson used this testimony to renew her effort to admit the Jones Report, arguing that Dr. Chamberlain was making a claim about Dr. Salem's standard practice that appeared to run counter to what was clearly stated in the report. The District Court again denied Henderson's request, finding that Dr. Chamberlain's testimony was limited only to *his* experience with Dr. Salem, and he was not the resident who assisted Dr. Salem during the Jones surgery. Thus, the District Court ruled that Henderson's cross-examination must be limited to Dr. Chamberlain's experience working on surgeries with Dr. Salem.

In a final attempt to convince the trial judge to admit the Jones Report, Henderson argued that the admission of the evidence caused no prejudice to defendants, let alone unfair prejudice. She noted that Dr. Salem's deposition made no mention of other litigation, and, even if it did, the parties could craft "curative language" to ensure that no juror could infer that Dr. Salem was subject to separate lawsuits.

The District Court found this argument unavailing. The trial judge indicated that his ruling would not change, and added that the Jones Report was in no way crucial to Henderson's case. He specifically stated that Henderson was pursuing a number of avenues to demonstrate that Dr. Salem violated the standard of care, so that by denying the admission of these pieces of evidence, only a small portion of her case was affected.

Following a seven-day trial, on January 27, 2005, the jury returned a verdict finding that Dr. Salem had not breached the standard of care owed to Henderson. Henderson now appeals, seeking a reversal of the jury's verdict and a remand for a new trial.

## II. ANALYSIS

### A. Standard of Review

A trial court may prevent the introduction of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. In considering a trial judge's application of Rule 403, the Supreme Court has stated the standard of review as "abuse of discretion." *See, e.g., Old Chief v. United States,* 519 U.S. 172, 191, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *United States v. Abel,* 469 U.S. 45, 55, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). The

Court has added no qualifiers. This court, however, has described the standard of review applicable to Rule 403 judgments as both "abuse of discretion" and "grave abuse of discretion." *Compare United States v. King*, 254 F.3d 1098, 1100 (D.C.Cir.2001) (abuse of discretion), *and United States v. Evans*, 216 F.3d 80, 87 (D.C.Cir.2000) (same), *with United States v. Watson*, 409 F.3d 458, 463 (D.C.Cir. 2005) (grave abuse), *and United States v. Whitmore*, 359 F.3d 609, 619 (D.C.Cir. 2004) (same). It is clear that there is no material difference between "abuse of discretion" and "grave abuse of discretion" with respect to the standard of review relating to judgments rendered under Rule 403. Rather, under either formulation, the appellate court is extremely wary of second-guessing the legitimate balancing of interests undertaken by the trial judge. We defer no more and no less under either characterization of the standard of review. "Grave abuse of discretion" is nothing more than a shorthand expression of wariness.

And the court's use of the word "grave" certainly does not suggest an insurmountable standard of review. In the *Watson* decision, for example, we used the phrase "grave abuse," and yet noted that, in applying Rule 403, the District Court must be "cautious" against excluding evidence "where a party is seeking to impeach a witness whose credibility could have an important influence on the outcome of the trial." 409 F.3d at 463. Likewise, in *United States v. Cassell*, 292 F.3d 788 (D.C.Cir.2002), which also employs the "grave abuse" language in describing the standard of review with respect to judgments under Rule 403, the decision tellingly states that "Rule 403 tilts, as do the rules as a whole, toward the admission of evidence in close cases." *Id.* at 795 (quotation and citation omitted). "In performing the balancing test required under Rule 403, it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged." *Id.* (quotation and citation omitted).

In short, in all cases arising under Rule 403, we assume that the trial judge generally is in the best position to balance the probative value of the disputed evidence against the risks of prejudice and confusion and, thus, retains broad discretion to decide the matter. We have never suggested, however, that the trial judge retains unfettered discretion in the application of Rule 403. When the District Court excludes admissible evidence based on an understatement of the probative value of the excluded evidence, a miscalculation of the "danger of unfair prejudice, confusion of the issues, or misleading the jury," or an erroneous calculation of whether the "probative value" of the excluded evidence is "substantially outweighed" by these dangers (or by "considerations of undue delay, waste of time, or needless presentation of cumulative evidence"), then the trial court's judgment under Rule 403 is subject to reversal.

## B. The Alleged Dangers of Unfair Prejudice and Confusion of the Jury

◼ The District Court maintained throughout trial that it was concerned that the admission of the Jones Report would unfairly prejudice appellees and potentially lead to jury confusion. The danger presented by those issues, it believed, would substantially outweigh any probative value offered by the Jones Report. In terms of unfair prejudice, the District Court was of the opinion that the introduction of the Jones Report might undermine the court's earlier decision to sever the Henderson, Grant, and Jones malpractice claims. This was a possibility, according to the District Court, because the admission of a post-

surgery report relating to someone other than Henderson might lead the jurors to conclude that there was also another lawsuit pending against Dr. Salem. As for jury confusion, the District Court stated, with little explanation, that the jurors might have difficulty sorting through the distinct issues relevant to the Jones and Henderson surgeries.

Appellant does not suggest that it would not be prejudicial for the jury to learn about the other lawsuits; rather, her claim is that the *danger* of that outcome was quite small. At trial, appellant noted that nothing in the relevant portions of the Jones Report and in Dr. Salem's corresponding deposition testimony implied that there had been other litigation. In addition, appellant stated that, as a precaution, the trial court could have issued a "curative instruction" to temper any potentially prejudicial language in Dr. Salem's deposition testimony.

Henderson's argument is compelling. On the record at hand, there is little reason to believe that the admission of the Jones Report would have led to the outcomes feared by the District Court. The introduction of the five-page report would have been for the limited purpose of demonstrating that Dr. Salem had in fact made a three-centimeter anastomosis in another surgery. Nothing in the report refers to other litigation. Moreover, in the relevant portions of the disputed deposition testimony, neither Henderson's counsel nor Dr. Salem suggests that another lawsuit has been filed. Neither the Jones Report nor the related deposition testimony offers the slightest hint that Jones had filed a lawsuit against Dr. Salem.

In short, the District Court's concern over unfair prejudice is unfounded. And appellees' bald assertion that the introduction of the Jones Report and the discussion of it in Dr. Salem's deposition would lead jurors to unfairly prejudge Dr. Salem is specious. The Jones Report undoubtedly would have assisted Henderson in her cause of action against Dr. Salem. But that is the function of probative evidence, and it surely is not the measure of "unfair prejudice" under Rule 403.

The District Court's concern over possible jury confusion is equally misplaced. Appellant made it clear that the Jones Report would be offered to make a limited, easily understood point relating to the size of the anastomosis described on page three of the report. There was no serious possibility that the jury would confuse the Jones and Henderson surgeries, because, as appellant made clear, the sole question posed by the Jones Report was whether the language used to document the Jones surgery described a three-centimeter anastomosis measured internally or externally.

It is extremely unlikely, as appellees contend, that the admission of the Jones Report would lead to a "trial within a trial." Dr. Salem admitted that the Jones Report was dictated and recorded accurately, *see* Salem Dep. at 46, J.A. 383, so appellees have raised no issue over the authenticity or veracity of the report. The only dispute raised by the report is whether it describes the internal or external diameter of the anastomosis. This is a matter about which experts testify all the time in jury trials. We assume that jurors will comprehend what they hear, especially as the issues are amplified by direct, cross-, and redirect examination, jury instructions, and closing arguments.

Appellees argue that if the Jones Report had been admitted into evidence, they would have been forced to call Dr. Paul Steinwald, the surgical resident who assisted Dr. Salem during the Jones surgery, as if to suggest that his testimony might be too complex for the jury to understand. This argument borders on frivolous. If

called, Dr. Steinwald's testimony would have focused on the question of what the reference to three centimeters in the Jones Report was meant to convey. This certainly would not have been unduly confusing to the jury, any more than the other technical information offered by appellees to defend themselves against Henderson's claim.

Finally, relying upon *Weil v. Seltzer*, 873 F.2d 1453, 1460–61 (D.C.Cir.1989), appellees contend that "evidence concerning a doctor's [treatment of] former patients .... should ... be[ ] analyzed under Rule 404(b) to see if it qualifie[s] for admission under Rule 404(b)'s limited purposes." Br. for Appellees at 17. Assuming, as the parties do here, that a physician's prior conduct does not rise to the level of "the nonvolitional, habitual type that ensures its probative value" under Rule 406 as habit evidence, *see Weil*, 873 F.2d at 1461, and speaking only with respect to the Jones Report, we agree. Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," although "former patient evidence may ... be[ ] admissible for other purposes, *i.e.,* to show plan, knowledge, identity, or absence of mistake or accident," *Weil*, 873 F.2d at 1461 (discussing Rule 404(b)). In *Weil*, the estate of a doctor's former patient sued for wrongful death, because the patient had been given steroids for a prolonged period while having been led to be believe he was receiving antihistamines. *Id.* at 1456. Five other patients testified that the doctor had also prescribed steroids for them while representing the drugs to be antihistamines or decongestants. *Id.* at 1460. After concluding that prescribing steroids did not amount to a habit under Rule 406, we noted that the plaintiff was essentially trying to introduce "bad acts" testimony under Rule 404(b): "This evidence of [the

doctor's] treatment of the former patients was clearly an attempt to show that [the doctor] treated Weil in conformity with his treatment of the five testifying patients." *Id.* at 1461.

If Henderson only possessed and sought to introduce the Jones Report, given the specific content of that report, *Weil* would control and this matter would be an easy one under Rule 404(b). In other words, Henderson could not introduce the report to show that because Dr. Salem improperly created a three-centimeter anastomosis in another patient, he must have done so in an unrelated surgery as well. *See id.* (evidence that is not admissible under Rule 404(b) would be "undoubtedly prejudicial to [the] defense"). What makes the issue of "unfair" prejudice more challenging in this case is, as we shall discuss, Dr. Salem's having tied the size of Henderson's anastomosis to the size of Jones' anastomosis. *Cf. id.* ("For the former patient testimony to be at all probative it must show that [the doctor] responded the same way with each patient as he did with the testifying patient."). We need not, and do not, express any opinion, however, on whether, given Dr. Salem's testimony, appellees would suffer unfair prejudice with the admission of the Jones Report as part of Henderson's direct case, because (1) the District Court did not reach an evidentiary ruling considering Rule 404(b) as part of its Rule 403 balancing, and (2) regardless of whether our standard of review would permit reversal for keeping the Jones Report out as affirmative evidence, it most assuredly was an abuse of discretion to keep the Report out as impeachment, rebuttal, and rehabilitative evidence in light of appellees' subsequent conduct, as shall become clear.

In sum, there is very little to support the District Court's findings that admission of the Jones Report and the related

deposition testimony would result in "danger of unfair prejudice, confusion of the issues, or misleading the jury." The record in this case simply does not bear out the concerns raised by appellees and credited by the District Court. The only remaining question, then, is whether the District Court acted within its permissible discretion in finding that the probative value of the excluded evidence was so slight that it was "substantially outweighed" by the insignificant indications of possible prejudice and confusion to the jury. The record in this case *clearly* belies this conclusion.

## C. Probative Value of the Excluded Evidence

The District Court found that the Jones Report had limited probative value, in large part, because it believed that Henderson could achieve her evidentiary objectives by posing "hypothetical" questions based on the text of the report without mentioning the report's existence. The District Court further minimized the probative value of the Jones Report by suggesting that Henderson had no great need to introduce the report. On this score, the trial court perceived that Henderson had other evidence beyond the report to support her anastomosis theory, and also observed that an oversized anastomosis was just one of four theories of liability she furthered.

Appellant contends that the District Court apparently misunderstood the importance to plaintiff of being able to rely on the Jones Report itself, not merely "hypothetical" questions based on the text of the report. In other words, Henderson forcefully argues that, in presenting her case to the jury, "hypothetical" questions drawn from an unidentified report were not a fair or reasonable substitute for introduction of the Jones Report itself. Indeed, appellees obviously understood this, because they fought vigorously to exclude the Jones Report. Appellant also argues that the District Court greatly miscalculated the value of the other evidence supporting her claim about the size of the anastomosis.

In challenging the District Court's findings, appellant claims that there are four ways in which the Jones Report has significant probative value: (1) as affirmative evidence that Dr. Salem made her anastomosis three centimeters; (2) to impeach the testimony of Dr. Salem that he made her anastomosis 1 to 1.5 centimeters; (3) to rebut the testimony of Dr. Chamberlain, who attempted to establish that Dr. Salem always made anastomoses 1 to 1.5 centimeters; and (4) to rehabilitate Dr. Balliro's credibility after he was "sandbagged" by appellees on cross-examination. Again, appellant's arguments are compelling.

### 1. *Evidentiary Alternatives to the Admission of the Jones Report*

There is no doubt that the District Court placed undue weight on appellant's ability to ask "hypothetical" questions related to the content of the Jones Report. The trial judge stated:

It seems to me that there is no necessary prejudice to the Plaintiff's case by confining Dr. Balliro's examination to hypotheticals which can allude to the same facts that are the facts that underlie the operative report in Jones, without identifying the Jones case, without specifically pointing to the Jones case and creating any risk that the jurors might see that the deposition was not a deposition just about the [Henderson] case but about a couple of other cases.

Trial Tr. (1/19/05) at 93. Henderson maintains, however, that by restricting her expert, Dr. Balliro, to analysis emanating from a question based on a "hypothetical,"

the District Court rendered his testimony "pointless." We agree. Dr. Balliro's testimony amounted to an opinion that *if* the surgical procedure described in the hypothetical was performed during the Henderson surgery, then Dr. Salem constructed a three-centimeter anastomosis, measured internally, in Henderson. Without admitting the Jones Report, or allowing Dr. Balliro to state that the "hypothetical" description was taken from a post-surgery report relating to another procedure performed by Dr. Salem, there was no way to connect the Jones Report language with Dr. Salem's deposition testimony that he always makes his anastomoses the same size. Thus, the hypothetical approach mandated by the District Court was a meaningless alternative to admitting the Jones Report.

■ We also find that the District Court placed far too much weight on the value of the endoscopy film. It is well established that under Rule 403, a court should weigh the probative value of evidence in light of appropriate evidentiary alternatives. *See Old Chief,* 519 U.S. at 182–85, 117 S.Ct. 644; *see also* 22 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5214, at 269 (1978) ("The prejudice to an opponent can be said to be 'unfair' when the proponent of the evidence could prove the fact by other, non-prejudicial evidence."). However, evidentiary alternatives are relevant only when introduction of the preferred evidence would result in prejudice. As discussed above, the record here does not support the conclusion that introduction of the Jones Report would have resulted in cognizable prejudice to appellees or caused confusion in the jury.

■ In any event, even if we assume, *arguendo,* that introduction of the Jones Report might have been prejudicial, we still must consider whether the alternative evidentiary avenues open to appellant offered substantially the same or greater probative value but a lower danger of unfair prejudice. As the Court noted in *Old Chief,*

> As for the analytical method to be used in Rule 403 balancing ... [a] court would decide whether a particular item of evidence raised a danger of unfair prejudice. If it did, the judge would go on to evaluate the degrees of probative value and unfair prejudice not only for the item in question but for any actually available substitutes as well. If an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfairly prejudicial risk.... [T]he judge would have to make these calculations with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case, and the mere fact that two pieces of evidence might go to the same point would not, of course, necessarily mean that only one of them might come in. It would only mean that a judge applying Rule 403 could reasonably apply some discount to the probative value of an item of evidence when faced with less risky alternative proof going to the same point.

519 U.S. at 182–83, 117 S.Ct. 644. In other words, "[t]he probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point." *Id.* at 185, 117 S.Ct. 644 (quotation and citation omitted).

In this case, the District Court apparently thought that appellant could have

made use of endoscopy pictures to prove her case and thus avoid having to introduce the Jones Report. There are two problems with this assumption. First, there was no way for an expert to conclusively determine the size of the anastomosis in the film. As Dr. Balliro noted at trial, the film contained no reference points indicating how to assess the relative size of the magnified stomach area. Moreover, Dr. Balliro admitted that he could not even "be 100 percent sure" that he could identify the anastomosis on the endoscopy film. *See* Trial Tr. (1/21/05) at 231. Second, assuming that the anastomosis could have been identified, this would not have given appellant the probative evidence that she needed. Henderson's endoscopy was done approximately seven years after her initial surgery. Experts on both sides confirmed that the anastomosis could have expanded during the seven-year interval between the surgery and the trial. Therefore, even if her expert could have testified with certainty that the anastomosis in the film was three centimeters, this would have been, at best, very weak evidence that Henderson's anastomosis was three centimeters immediately after her surgery.

The District Court also misconceived the number of distinct theories of liability appellant was pursuing. The trial judge identified what he believed to be four breaches of the standard of care advanced by plaintiffs:

> One is the size of the pouch. One is the positioning of the staple line.... The size of the anastomosis is yet another. And then the length of the Roux-en tube ... is yet another theory under which you had an expert who sat right there and said the standard was violated ...— that would be four things.

Trial Tr. (1/24/05) at 369. In fact, appellant was pursuing only two serious surgical

missteps—one involved the size of the anastomosis, and the other concerned the size of the stomach pouch. Appellant's counsel discussed this in conference with the trial judge, *see id.,* and reiterated the point during his summation to the jury, *see* Trial Tr. (1/26/05) at 709–10.

Based on the foregoing, it is apparent that the District Court placed too much emphasis on alleged alternatives to introducing the Jones Report. Appellant did not have strong evidence outside of the Jones Report to support her anastomosis case, nor did the "hypothetical" avenue devised by the District Court cure that problem. In other words, unless the Jones Report is utterly lacking in probative value, there is nothing to indicate that appellant had evidentiary alternatives that offered "substantially the same or greater probative value" as the report. We turn now to the probative value of the Jones Report itself.

### 2. *Affirmative Evidence*

According to appellant, the Jones Report is a clear representation that, in a Roux–en–Y surgery, Dr. Salem made a three-centimeter anastomosis. Based on the connection between the Jones Report and Dr. Salem's deposition, during which he said that, in surgery, he *always* made his anastomoses the same size, appellant contends that this gives strong evidence of the fact that the anastomoses in the Jones and Henderson surgeries were the same, *i.e.,* three centimeters. Henderson characterizes this evidence as "the most probative evidence on the key issue in th[e] case." Br. for Appellant at 22–23.

As affirmative evidence, the Jones Report and corresponding deposition testimony by Dr. Salem clearly has probative value, although to what degree is unclear. Immediately following Dr. Salem's answer that he made his anastomoses the same

size every time, he qualified that statement by claiming that he "generally" made them one centimeter. *See* Salem Dep. at 39, J.A. 376. Dr. Salem also conceded that the Jones Report was accurate, but clarified that the three-centimeter anastomosis described in the report was measured from the outside and not the inside—accounting for the size discrepancy. While that explanation is subject to debate, its existence may limit the persuasiveness of the apparent three-centimeter "admission." In other words, although the Jones Report is probative, it is not necessarily conclusive affirmative evidence supporting Henderson's case.

If the only issue here concerned whether the District Court abused its discretion in denying the Jones Report as affirmative evidence at the start of appellant's case, then the matter might be close. But Henderson sought to introduce the Jones Report not just as affirmative evidence in support of her cause of action, but also for purposes of impeachment, rebuttal, and rehabilitation. On these scores, it cannot be seriously doubted that the Jones Report is highly probative and not substantially outweighed by any dangers of unfair prejudice, confusion of the issues, or misleading the jury.

### 3. *Impeachment, Rebuttal, and Rehabilitative Evidence*

Appellant contends that the District Court should have permitted the Jones Report and relevant deposition testimony to be introduced in *response* to the case appellees presented at trial. Specifically, appellant contends that the probative value of the Jones Report was obvious as it related to her need to impeach and rebut the testimony offered by Dr. Salem and his colleague, Dr. Chamberlain, as well as to rehabilitate Dr. Balliro. We agree.

When putting on their case at trial, appellees made every effort to establish that Dr. Salem *routinely* made his anastomoses 1 to 1.5 centimeters in diameter. Dr. Salem stated this himself, and Dr. Chamberlain, the former chief resident at George Washington Medical Center, also testified as such. Specifically, Dr. Chamberlain offered that in his "10 to 15 times" participating in Roux–en–Y surgeries with Dr. Salem, it was Dr. Salem's common practice "to make the anastomosis between 1 and 1–1/2 centimeters in size." Trial Tr. (1/21/05) at 310. Dr. Chamberlain asserted that this "would be the size we try to do every time." *Id.* at 311.

The probative value of the Jones Report to rebut the testimony of Dr. Salem and Dr. Chamberlain is undeniable. The Jones Report on its face directly contradicts Dr. Salem's claim that he always made his anastomoses 1 to 1.5 centimeters. In addition, the need for and relevance of the Jones Report was heightened when appellees attempted to corroborate Dr. Salem's claim of consistency through the testimony of Dr. Chamberlain.

Appellees argue that since Dr. Salem made the same interior/exterior measurement distinction in his deposition that he did at trial, the Jones Report was consistent and therefore would not impeach his testimony. This claim has no merit. It is an open question whether the internal/external distinction is valid. The language describing Helen Jones' anastomosis cuts against Dr. Salem's attempt to explain away the three-centimeter anastomosis as being measured externally.

Appellant presents an even stronger case for admission of the Jones Report to rehabilitate her expert witness, Dr. Balliro. Appellant alleges that, both during cross-examination and in their closing argument, appellees improperly used the unavailabili-

ty of the Jones Report to discredit Dr. Balliro.

On cross-examination, the specter of the Jones Report arose in the following exchange between defense counsel and Dr. Balliro:

Q: Doctor, I ask this for the record, but you were not present during the surgeries that were performed on Mrs. Henderson, correct?

A: Correct.

Q: But in the report that you authored back in January of 2003, what you indicated was that the anastomosis was certainly no less than 3 centimeters in diameter, did you not?

A: Yes, but I had evidence that you are aware of as to why that was, in fact, the case.

Q: Now, the specific dimension of the size or the width of the anastomosis is not described in the [Henderson] operative note, is it, sir?

A: Yes, sir, that is not the evidence to which I am referring.

Q: Excuse me, Doctor, can you follow my question?

Trial Tr. (1/21/05) at 224–25. From the above exchange, it is clear, as appellant argues, that appellees used the court's previous exclusion of the Jones Report—on which Dr. Balliro relied in determining that the anastomosis was three centimeters—to destroy his credibility.

Appellees followed this same strategy, taking it one step further, during their summation to the jury. Appellees' counsel argued to the jury,

as I have pointed out, not only do we know what the anastomosis size was now, we know that what the Plaintiff basically has done is tried to create the facts to fit the theory of the case. And when [Plaintiff's counsel] hasn't been able to change the facts well enough to

fit the theory, he disregards the facts and he makes up 3 centimeters. I submit to you that's not fair. . . . [I]t is not fair to make them up.

Trial Tr. (1/26/05) at 744. Had the Jones Report been in evidence, appellees could not have "sandbagged" appellant in this manner. They knew that the Jones Report was excluded, however, and opportunistically used that ruling not only to shield themselves from potentially damaging evidence, but also to use it as a sword to slice through the foundation of much of appellant's case.

■ Appellees respond that the evidence has no foundation for admission for rehabilitative purposes because appellant failed to meet the threshold for the "curative admissibility" doctrine. Under this doctrine, "the introduction of inadmissible or irrelevant evidence by one party justifies or 'opens the door to' admission of otherwise inadmissible evidence." *United States v. Brown*, 921 F.2d 1304, 1307 (D.C.Cir.1990). In this case, appellees assert that their questioning of Dr. Balliro was strictly limited to the existence, or lack thereof, of a reference to a three-centimeter anastomosis in the *Henderson* post-surgery report. Thus, they claim that they did not "open the door" to the admission of otherwise inadmissible evidence, because they never mentioned the Jones Report. This argument is entirely unconvincing.

■ There is little question that this is the kind of situation that the "curative admissibility" doctrine sought to "cure." As one of our sister circuits has noted, not only is the trial court granted discretion to permit a party to introduce otherwise inadmissible evidence on an issue "when the opposing party has introduced inadmissible evidence on the same issue," but it may also do so "when it is needed to rebut a

false impression that may have resulted from the opposing party's evidence." *United States v. Rosa,* 11 F.3d 315, 335 (2d Cir.1993). In this instance, appellees' disingenuous use of the District Court's inadmissibility ruling put Dr. Balliro, and, in turn, appellant, in an untenable position. Appellees could have supported their case just as forcefully by limiting their cross-examination to the endoscopy film and to whether Henderson's post-surgery report indicated a three-centimeter anastomosis. The fact that they went well beyond this, gratuitously undercutting Dr. Balliro, should have led the District Court—buttressed as well by appellant's need of the Jones Report for impeachment and rebuttal—to allow the admission of the report.

## D. Abuse of Discretion

In a case of this sort, where (1) the excluded evidence goes to the heart of a party's case and appears crucial to the outcome of the case, (2) the opposing party has used the excluded evidence as a shield to enhance its case and effectively destroy the other side's claim, and (3) prejudice to the party opposing the admission of the evidence appears minimal (save for the possibility that the evidence will work to the advantage of the party who seeks its admission), we hold that the District Court abused its discretion in excluding the disputed evidence. We need not decide, however, whether it would have been an abuse of discretion had the District Court excluded the Jones Report as affirmative evidence in the absence of Dr. Chamberlain's testimony and the sandbagging undertaken by appellees.

### III. CONCLUSION

For the foregoing reasons, the jury's verdict is vacated, the District Court's judgment on that verdict is reversed, and the case is remanded for a new trial.

*So ordered.*